1  Craig A. Brandt (SBN 133905)
   LAW OFFICE OF CRAIG A. BRANDT
2  5354 James Avenue
   Oakland, CA  94618
3  Telephone: (510) 601-1309
   Email:  craigabrandt@att.net
4
   Attorney for Plaintiff
5  EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC

6                    UNITED STATES DISTRICT COURT

7                    NORTHERN DISTRICT OF CALIFORNIA

8

9  EDEN ENVIRONMENTAL CITIZEN'S          )   Case No: _____
   GROUP, LLC, a California limited liability )
   company,                              )   **COMPLAINT FOR INJUNCTIVE AND**
10                                        )   **DECLARATORY RELIEF, CIVIL**
                  Plaintiff,             )   **PENALTIES AND REMEDIATION**
11                                        )
            vs.                          )
                                         )   **(Federal Water Pollution Control Act, 33**
12 CARDINAL PAINT AND POWDER, INC.,       )   **U.S.C. §§1251 et seq.)**
   as a domestic foreign corporation organized )
13 and existing under the laws of the State of )
   Nevada, and DOES 1-10, inclusive,     )
14                                        )
                  Defendant.             )
15 _____  )

16        Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") hereby

17 brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the

18 Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*

19                              **INTRODUCTION**

20    1.    This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and

21 remediation against Defendant for current and ongoing violations of the National Pollutant

22 Discharge Elimination System ("NPDES") permit requirements of the CWA.

23

24

2.      On or about September 27, 2022, EDEN provided a Notice of Defendant's violations to Defendant Cardinal Paint And Powder, Inc., ("CARDINAL PAINT AND POWDER"), by certified mail as required by the CWA. 33 U.S.C. § 1365(b)(1)(A). The Defendant's base of operations is located at 890 Commercial Street, San Jose, California (Facility").

3.      On or about September 26, 2022, EDEN provided a Notice of Defendant's violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, and (3) Executive Director of the State Water Resources Control Board ("State Water Board").

4.      A copy of EDEN's Notice of Intent to Sue is attached hereto as Exhibit "A" and hereby incorporated herein by reference. (Exhibit A, "60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act").")

5.      More than sixty days have passed since EDEN's Notice was properly and lawfully served on Defendant, the State Board, and the Regional and National EPA Administrators. EDEN is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the Clean Water Act ("CWA"), 33 U.S.C. § 1319(g).

### JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C.

1   sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil

2   penalties).

3       7.      The Permit under which this case arises is a Federally required permit based upon

4   California state substantive law.  (*Southern California Alliance of Publicly Owned Treatment*

5   *Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of*

6   *Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016))

7       8.      By its express language, a violation of the State permit constitutes a per se violation of

8   the Federal Clean Water Act.  (California's Industrial General Permit Order 2014-0057 DWQ,

9   NPDES Order No. CAS000001, Section XXI.A)

10      9.      Venue is proper because Defendant reside in and the events or omissions giving rise to

11  EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper

12  because the Facility's CWA violations have occurred and are occurring within the District. 33

13  U.S.C. § 1365(c)(1).

**PARTIES**

15      10.     Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") is an

16  environmental membership group organized under the laws of the State of California as a limited

17  liability company on June 1, 2018.  EDEN previously existed as an unincorporated

18  environmental citizen's association, with members who remain associated with EDEN as of the

19  date of the filing of this Complaint.

20      11.     EDEN's organizational purpose is the protection, preservation and enhancement of

21  California's waterways. Its mission is implemented by enforcing the provisions of the Federal

22  Clean Water Act and California's Industrial General Permit by seeking redress from

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION
Page 3

1  environmental harms caused by Industrial Dischargers who pollute the Waters of the United
2  States, through community education and citizen suit enforcement when necessary.

3  12.    EDEN's members donate their time and money resources to protect, enhance, and assist
4  in the preservation and restoration of rivers, creeks, streams, wetlands, vernal pools, and their
5  tributaries located in California.

6  13.    EDEN has members that reside, work and pursue recreational activities near the
7  affected Receiving Waters. The Facility discharges storm water into a municipal storm drain
8  system which then discharges to the Guadalupe River, a tributary of the San Francisco Bay. The
9  San Francisco Bay is the "Receiving Waters" for the Facility and is listed for water quality
10  impairment under the Clean Water Act, Section 303(d) - list for the following: chlordane;
11  dichlorodiphenyltrichloroethane (DDT); dieldrin; dioxin compounds (including 2,3,7,8-
12  tetrachlorodibenzo-pdioxin); furan compounds; invasive species; mercury; polychlorinated
13  biphenyls (PCBs); PCBs (dioxin-like); selenium, and trash. Eden members use those waters and
14  their watersheds for surfing, kayaking, camping, cycling, recreation, sports, fishing, swimming,
15  hiking, photography, nature walks and scientific study.  Their use and enjoyment of these natural
16  resources have been and continue to be adversely impaired by Defendant's failure to comply
17  with the procedural and substantive requirements of the California Industrial General Permit and
18  Federal Clean Water Act.

19  14.    EDEN has standing as an association to bring this suit against Defendant, as at least one
20  of EDEN's current members is experiencing ongoing and continuing harm particular to him or
21  her as a specific result of Defendant's violations of the CWA, and the resulting adverse effects to
22  the environment and the Receiving Waters downstream from the Facility, and has experienced

23

24

1   such harm since at least the date that EDEN provided to Defendant a 60-day Notice of Intent to

2   Sue.

3      15.    Specifically, the individual member(s) who are experiencing harm from Defendant's

4   violations of the CWA are reluctant to utilize the Receiving Waters downstream from the

5   Facility as specified in Paragraph 13, above, due to the pollution caused by Defendant's

6   environmental violations that EDEN's members believe has entered into the Facility's Receiving

7   Waters; and the aesthetic and recreational interests of these members has been adversely

8   impacted.

9      16.    Defendant's ongoing violations of the California Industrial General Permit and the

10  CWA have and will continue to cause irreparable harm to EDEN and certain of its current

11  members, for which they have no plain, speedy, or adequate remedy.  The relief requested will

12  redress the ongoing injury in fact to EDEN and its members.  Litigation of the claims asserted

13  and the relief requested in this Complaint will not require the participation in this lawsuit of

14  individual members of EDEN.

15     17.    EDEN is informed and believes, and on such information and belief alleges, that

16  Defendant CARDINAL PAINT  AND POWDER was originally formed on or about October 25,

17  2010, as a California corporation and subsequently merged, out on or about June 27, 2016, to a

18  domestic foreign corporation organized and existing under the laws of the State of Nevada.

19     18.    EDEN is informed and believes, and on such information and belief alleges, that,

20  Defendant CARDINAL PAINT  AND POWDER, on or about June 23, 2015, submitted a Notice

21  of Intent ("NOI") to be authorized to discharge storm water from the Facility under the

22  California Industrial General Permit ("General Permit") and was assigned Waste Discharger

23  Identification number ("WDID") 2 43I006716, according to the Regional Water Board's records.

24

1

**STATUTORY BACKGROUND**

2  19.   Congress declared that the Federal Clean Water Act was designed to "restore and

3  maintain the chemical, physical, and biological integrity of the Nation's waters" through federal

4  and state cooperation to develop and implement "programs for preventing, reducing, or

5  eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a).

6  20.   Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant

7  into waters of the United States, unless such discharge is in compliance with various enumerated

8  sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by,

9  or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33

10  U.S.C. § 1342.

11  21.   Section 402(p) of the Act establishes a framework for regulating municipal and

12  industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with

13  approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm

14  water discharges through individual permits issued to dischargers or through the issuance of a

15  single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. §

16  1342(p).

17  22.   Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S.

18  EPA has authorized California's State Board to issue NPDES permits including general NPDES

19  permits in California.

20       General Permit

21  23.   The State Water Board elected to issue a statewide general permit for industrial storm

22  water discharges. The State Water Board originally issued the General Permit on November 19,

23  1991, and modified it on September 17, 1992.   The State Water Board reissued the General

24

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION
Page 6

Permit on April 17, 1997, and again on April 1, 2014 (the "2015 Permit" or "General Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The 1997 Permit was in effect between 1997 and June 30, 2015. The 2015 Permit went into effect on July 1, 2015. The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

24.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

25.     The General Permit contains several prohibitions. Effluent Limitation Section V(A) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition Section III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

26.     Receiving Water Limitation Section VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation Section VI(A) and Discharge Prohibition Section III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

27.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity which have not obtained an

individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

28.      Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit, Section X(C). These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

29.      To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, Section X(B).

30.      Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet Section I (1).

31.      Sections X(D) – X(I) of General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of a specific mandatory

set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges.

32.    The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  General Permit, Section X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.

33.    The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  General Permit, Section X(H)(4), (5).

34.    The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program. The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

35.    As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

36.    Section XI(B) of the General Permit requires that Dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year

(January 1 to June 30), and that the samples be collected from all outfalls identified in the Facility SWPPP.

37.    A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.  General Permit Section XI(B)(2)

38.    Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload into SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit Section XI(B)(4)

39.    Facilities are also required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  General Permit, Section XI(A)

40.    The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, Section XV.

41.    Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, as well as additional parameters indicated in the Permit by facility type and those parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit, Section XI(B)(6)(c).

42.    The United States EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite

BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.

43.     The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks. The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

44.     The following annual NALs have been established under the General Permit for pollution parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("S.U."); total suspended solids ("TSS") – 100 mg/L; oil & grease ("O&G") – 15 mg/L.

45.     An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  General Permit Section XII(A)

46.     When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  General Permit Section XII(C)

47.     For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the

exceedance is solely due to the presence of the pollutant in the natural background.  General

Permit Section XII(D)

48.     Section XVI(A) of the General Permit requires that all Dischargers must certify and

submit via SMARTS an Annual Report no later than July 15th following each reporting year

using the standardized format and checklists in SMARTS.

49.     Furthermore, Section XXI(L) of the General Permit provides that all documents

submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a legally

responsible party or duly authorized representative of the Facility, with the following

certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

50.     Section XXI(N) of the General Permit provides that any person who knowingly makes

any false material statement, representation, or certification in any record or other document

submitted or required to be maintained under the General Permit, including reports of

compliance or noncompliance shall upon conviction, be punished by a fine of not more than

$10,000, or by imprisonment for not more than two years, or by both.  *See* also Clean Water Act

section 309(c)(4).

San Francisco Bay Regional Basin Plan

51.     The Water Quality Control Board, San Francisco Bay Region has adopted the "San

Francisco Bay Basin (Region 2) Water Quality Control Plan" ("Basin Plan"), as amended by

Resolution No. R2-2010-0100, setting forth the Water Quality Standards ("WQS") and beneficial uses for San Francisco Bay and its tributaries.

52.     The Beneficial Uses for San Francisco Bay are industrial service supply, shellfish harvesting, fish migration, preservation of rare and endangered species, fish spawning, commercial and sportfishing, estuarine habitat, wildlife habitat, recreational activities involving contact with water, recreational activities involving proximity to water, and navigation. *See* Basin Plan, Table 2-1.

53.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

54.     Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife. Discharges of pollutants at levels above WQS contribute to the impairment of the Beneficial Uses of the waters receiving the discharges.  WQS applicable to dischargers covered by the Storm Water Permit include, but are not limited to, those set out in the Basin Plan and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

55.     The Basin Plan sets forth, among other things, narrative WQS for floating material, Oil & Grease, sediment, settleable matter, and suspended materials, and sets forth numeric WQS for pH, arsenic, cadmium, chromium VI, copper, cyanide, lead, mercury, nickel, selenium, silver, tributyltin, zinc, and hydrocarbons ("PAHs"). *See* Basin Plan §§ 3.3.6, 3.3.7, 3.3.9, 3.3.12-3.3.14, 3.3.21, and Table 3-3.

56.     The Basin Plan also includes site specific objectives ("SSOs"), which are WQS for specific sites, for certain pollutants of concern, including copper and nickel. *See* Basin Plan,

Table 3-3A.  The CTR includes numeric criteria set to protect human health and the environment in the State of California.

57.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQS are violations of Receiving Water Limitations in Section VI.A of the General Permit.

Water Quality Impairment Area

The San Francisco Bay is listed for water quality impairment on the most recent Section 303(d) - list of the General Permit for the following: chlordane; dichlorodiphenyltrichloroethane (DDT); dieldrin; dioxin compounds (including 2,3,7,8-tetrachlorodibenzo-pdioxin); furan compounds; invasive species; mercury; polychlorinated biphenyls (PCBs); PCBs (dioxin-like); selenium, and trash.

Citizen Suit Provision of the CWA

58.     Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation. 33 U.S.C. §1365(a)(1). No action may be commenced "prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the [EPA] Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A).  By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

59.     In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the district court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a). Section 1319(d) declares that any person who violates any

permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192 per day for each violation occurring before November 2, 2015, and $51,570.00 per day per violation for violations occurring after November 2, 2015.   33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI.Q.1.

60.    Violations of provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

## FACTUAL ALLEGATIONS WHICH GIVE RISE TO CLAIMS

Defendant CARDINAL PAINT AND POWDER is an establishment that is primarily engaged in manufacturing paints (in paste and ready-mixed form); varnishes; lacquers; enamels and shellac; putties, wood fillers, and sealers; paint and varnish removers; paint brush cleaners; and allied paint products.

61.    EDEN is informed and believes that the Facility falls within the standard industrial classification ("SIC") 2851 – Paints, varnishes, lacquers, enamels, and allied products.

62.    The Facility discharges storm water into a municipal storm drain system which then discharges to the Guadalupe River, a tributary of the San Francisco Bay that is the "Receiving Waters" for the Facility.

63.    EDEN is informed and believes that CARDINAL PAINT AND POWDER stores industrial materials outdoors that can be exposed to storm water, eroded by wind, and otherwise contaminate the surrounding watershed.

64.    EDEN is informed and believes that based on its investigation, including a review of the Regional Water Board's records and aerial photographs storm water is collected and discharged from the Facility through a series of channels that discharge via at least one outfall.  The outfall

discharges storm water and pollutants contained in that storm water that eventually discharges into the Guadalupe River, a tributary of the San Francisco Bay a navigable Water of the United States.

65.     EDEN is informed and believes, and thereupon alleges that the storm water flows over the surface of the Facility where industrial activities occur and areas where airborne materials associated with the industrial processes at the Facility may settle onto the ground.  EDEN is informed and believes, and thereupon alleges that storm water flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the storm water channels.

66.     On information and belief, EDEN alleges that there are insufficient structural storm water control measures installed at the Facility.  EDEN is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.

Deficient SWPPP and Site Map

67.     On information and belief, EDEN alleges that since at least the beginning of the Facility's operations, Defendant CARDINAL PAINT AND POWDER has failed to develop an adequate SWPPP and a Site Map for the Facility, a violation of the General Permit, sections X, X(B), and XII(C)(2)(a).

68.     On information and belief, EDEN alleges that the Facility has failed to include the minimum required components of a Site Map and to upload an adequate SWPPP pursuant to the General Permit as detailed in EDEN's 60-Day Notice attached hereto as Exhibit A and

incorporated herein by reference. *See*, Exhibit A, "60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ('Clean Water Act');" pp. 4-7.

### Failure to Update and/or Amend the SWPPP

69.  On information and belief, EDEN alleges that on or about November 21, 2021, a Regional Water Board inspector photographed the Facility's sampling location number one, noting the location does not coincide with the Facility's site map, thus making the site map and/or SWPPP incorrect.

70.  On information and belief, EDEN alleges Defendant failed to update and/or amend the SWPPP to correct the sampling site err even after being ordered to do so by the Regional Water Board.

### Monitoring and Reporting Program – Monthly Visual Observations

71.  On information and belief, EDEN alleges that Defendant CARDINAL PAINT AND POWDER does not have an adequate storm water monitoring program at its Facility since at least the beginning of the Facility's operations, as required by Section XI.A of the General Permit.

72.  On information and belief, EDEN alleges that Defendant has failed to conduct monthly visual observations of storm water discharges at the Facility since at least the beginning of the Facility's operations, as required by the General Permit.

73.  Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the Guadalupe River, a tributary of the San Francisco Bay which is the "Receiving Waters" for the Facility.

1

<u>Failure to Collect and Analyze the Required Number of Storm Water Samples</u>

2    74.    The Defendant CARDINAL PAINT AND POWDER is required to collect and analyze

3    two storm water samples from the first half of the reporting year and two storm water samples

4    for the second half of the reporting year.

5    75.    On information and belief, EDEN alleges that Defendant failed to collect and analyze

6    the required number of storm water samples at the Facility since at least the beginning of the

7    Facility's operations, as required by the General Permit, sections XI.B2 and XI(B)(11)(a).

8    76.    On information and belief, EDEN alleges that during the 2015-2016 reporting year,

9    Defendant failed to collect and analyze any storm water samples from the first half of the

10    reporting year.

11    77.    On information and belief, EDEN alleges that during the 2016-2017 reporting year,

12    Defendant failed to collect and analyze one storm water sample from the first half of the

13    reporting year.

14    78.    On information and belief, EDEN alleges that during the 2017-2018 reporting year,

15    Defendant failed to collect and analyze one storm water sample from the first half of the

16    reporting year.

17    79.    On information and belief, EDEN alleges that during the 2018-2019 reporting year,

18    Defendant failed to collect and analyze one storm water samples from the first half of the

19    reporting year.

20    80.    On information and belief, EDEN alleges that during the 2020-2021 reporting year,

21    Defendant failed to collect and analyze two storm water samples from the first half of the

22    reporting year.

23

24

1

2

3

81.  On information and belief, EDEN alleges that during the 2021-2022 reporting year, Defendant failed to collect and analyze two storm water samples from the second half of the reporting year.

4

5

6

7

8

9

10

| Reporting Year | QSE's Sampled In First Half | QSE's Sampled In Second Half |
|---|---|---|
| 2015-16 | 0 | 3 |
| 2016-17 | 1 | 2 |
| 2017-18 | 1 | 3 |
| 2018-19 | 1 | 3 |
| 2019-20 | 0 | 3 |
| 2020-21 | 2 | 2 |
| Total Sampled | 7 | 12 |
| QSE's Required | 14 | 14 |
| **QSE's Missing** | **7** | 2 |

11

12

13

14

82.  Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the Guadalupe River, a tributary of the San Francisco Bay which is the "Receiving Waters" for the Facility.

15

Failure to Collect Storm Water Run-Off Samples During Qualified Storm Events

16

17

18

19

20

21

83.  On information and belief, EDEN alleges that Defendant has taken samples of storm water discharges at the Facility that failed to comply with the General Permit's requirement that storm water samples be preceded by a period without a discharge.  Under the General Permit a Qualified Storm Event ("QSE") is a precipitation event that both produces a discharge for at least one drainage area at the Facility and is also preceded by 48 hours with no discharge from any drainage area.

22

23

24

84.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on January 19, 2016 was not a valid QSE because it was made on the fifth consecutive day of rainfall, in violation of the General Permit.

85.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on October 28, 2016 was not a valid QSE because it was made on the ninth consecutive day of rainfall, in violation of the General Permit.

86.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on December 16, 2016 was not a valid QSE because it was made on the second consecutive day of rainfall, in violation of the General Permit.

87.    On information and belief, EDEN alleges that Defendant's collection of storm water samples on January 9, 2018 was not a valid QSE because it was made on the seventh consecutive day of rainfall, in violation of the General Permit.

88.    On information and belief, EDEN alleges that Defendant's collection of storm water samples on January 25, 2018 was not a valid QSE because it was made on the second consecutive day of rainfall, in violation of the General Permit.

89.    On information and belief, EDEN alleges that Defendant's collection of storm water samples on November 28, 2018 was not a valid QSE because it was not preceded by 48 hours of no rainfall, in violation of the General Permit.

90.    On information and belief, EDEN alleges that Defendant's collection of storm water samples on January 9, 2019 was not a valid QSE because it was not preceded by 48 hours of no rainfall, in violation of the General Permit.

91.  On information and belief, EDEN alleges that Defendant's collection of storm water samples on January 15, 2019 was not a valid QSE because it was not preceded by 48 hours of no rainfall, in violation of the General Permit.

92.  On information and belief, EDEN alleges that Defendant's collection of storm water samples on November 27, 2019 was not a valid QSE because it was made on the second consecutive day of rainfall, in violation of the General Permit.

93.  On information and belief, EDEN alleges that Defendant's collection of storm water samples on April 6, 2020 was not a valid QSE because it was made on the third consecutive day of rainfall, in violation of the General Permit.

94.   Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the Guadalupe River, a tributary of the San Francisco Bay which is the "Receiving Waters" for the Facility.

<u>Failure to Deliver Samples to a Laboratory Within 48 Hours of Collection</u>

95.  Defendant is required to deliver storm water run-off samples to a qualified laboratory within 48 hours of the date and time of physical collection of the sample; otherwise the samples are considered invalid for analysis.

96.  On information and belief, EDEN alleges Defendant's laboratory sample taken on November 27, 2019, was delivered to the laboratory one day late, a violation of the General Permit.

Failure to Sample Correctly for the Parameter pH

97.   On information and belief, EDEN alleges all of Defendant's laboratory analysis for the parameter pH were not completed within the required 15-minute holding period after collection of the storm water sample.

98.   On information and belief, EDEN alleges Defendant's laboratory reports from December 22, 2015 to November 30, 2021, showed evidence that sample collected for pH were not analyzed using a pH strip or calibrated pH meter and thus, were not conducted within the required 15-minute period holding time, a violation of the General Permit.

Failure to Upload Storm Water Sample Analyses Within Thirty (30) Days

99.   On information and belief, EDEN alleges that Defendant failed to upload into SMARTS all storm water sampling and analytical results within 30 days for each sampling event, a violation of the General Permit.

100.   On information and belief, EDEN alleges that the following results were more than thirty (30) days late:

| Sample Date | Date of Laboratory Report | Date Uploaded into SMARTS |
|---|---|---|
| 12/22/2015 | 01/05/2016 | Not uploaded |
| 01/19/2016 | 02/09/2016 | Not uploaded |
| 12/16/2016 | 01/03/2017 | Not uploaded |
| 11/16/2017 | Unclear from Report | Not uploaded |
| 01/09/2018 | Unclear from Report | Not uploaded |
| 01/25/2018 | Unclear from Report | Not uploaded |
| 02/26/2018 | Unclear from Report | Not uploaded |
| 11/28/2018 | 12/13/2018 | 06/28/2019 |
| 01/09/2019 | 01/21/2019 | 06/28/2019 |
| 01/15/2019 | 01/28/2019 | 06/28/2019 |
| 02/13/2019 | 02/25/2019 | 06/28/2019 |
| 11/27/2019 | 12/18/2019 | Not uploaded |
| 12/18/2019 | 01/03/2020 | Not uploaded |
| 04/06/2020 | 08/27/2020 | Not uploaded |
| 01/16/2020 | 04/21/2020 | Not uploaded |

| | | |
|---|---|---|
| 02/02/2021 | 02/15/2021 | 07/15/2021 |
| 03/19/2021 | 04/06/2021 | 07/15/2021 |
| 12/18/2019 | 01/03/2020 | Not uploaded |
| 10/22/2021 | 11/09/2021 | Not uploaded |
| 11/01/2021 | 11/30/2021 | Not uploaded |

Failure to *Manually* Enter Laboratory Test Results to SMARTS

101.  Under the General Permit, Defendant is required to *manually* enter all test results to SMARTS and it is not sufficient to simply upload the laboratory reports as a separate document. The test results must be manually entered to SMARTS because when the calculations are physically enter into the SMARTS system – the SMARTS system automatically calculates whether there are exceedances requiring further action by a Discharger. If the sample results are not manually enter into SMARTS, then a Discharger can negligently or intentionally hide the fact the Discharger has enter into Level 1 or Level 2 status, and thus avoid the requirements of the General Permit to take further action.

102.  On information and belief, EDEN alleges, on at least ten occasions, as outlined in the above chart, Defendant failed to *manually* enter all test results into SMARTS, a violation of the General Permit.

Failure to Analyze Storm Water Samples Identified as a Potential Pollution Source at The Facility - Zinc

103.  Under the General Permit, Defendant is required to conduct an assessment of potential pollution sources at the Facility and to incorporate the assessments findings into the SWPPP. Defendant is further required to test and analyze any additional parameter identified in the pollution assessment.

104.   On information and belief, EDEN alleges Defendant's SWPPP identified Zinc as a potential pollution source at the Facility, but failed to include Zinc as one of its testing parameters which is a violation of the General Permit.

105.   Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the Guadalupe River, a tributary of the San Francisco Bay which is the "Receiving Waters" for the Facility.

### Discharges of Contaminated Storm Water

106.   Information available to EDEN indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges in violation of the General Permit.

107.   Due to the nature of the operations at the Facility, coupled with the documented lack of proper BMP implementation and unauthorized non-storm water discharges, Defendant is discharging storm water containing excessive levels of pollutants specific to their operation during at least every significant local rain event.  These pollutants include storm water contaminated with pH affected substances, oil & grease ("O&G"), total suspended solids ("TSS") and Zinc.

### pH Exceedances

108.   The pollution parameters established by the EPA under the General Permit for pH affected substances is < 6.0 - 9.0 > standard units and for the Basin Plan it is a narrower range of < 6.5 – 8.0 > standard units.

1

2

3

109.  For the Reporting Years 2015-16 the storm water run-off was contaminated with pH affected substances measured at 3.43 standard units which was over both the Basin Plan parameters for pH and those parameters established by the EPA and the State Water Board.

4

5

6

110.  For the Reporting Years 2016-17 the storm water run-off was contaminated with pH affected substances measured at 5.26 standard units which was over both the Basin Plan parameters for pH and those parameters established by the EPA and the State Water Board.

7

8

9

111.  For the Reporting Years 2017-18 the storm water run-off was contaminated with pH affected substances measured at 4.27 standard units which was over both the Basin Plan parameters for pH and those parameters established by the EPA and the State Water Board.

10

11

12

112.  For the Reporting Years 2019-20 the storm water run-off was contaminated with pH affected substances which measured at 4.15 standard units was over both the Basin Plan parameters for pH and those parameters established by the EPA and the State Water Board.

13

14

15

113.  For the Reporting Years 2020-21 the storm water run-off was contaminated with pH affected substances measured at 0.00 standard units which was over both the Basin Plan parameters for pH and those parameters established by the EPA and the State Water Board.

16

17

18

114.  For the Reporting Years 2021-22 the storm water run-off was contaminated with pH affected substances which measured at 5.2 standard units was over both the Basin Plan parameters for pH and those parameters established by the EPA and the State Water Board.

19

20

21

22

115.  Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants, including, but not limited to, pH affected substances and Zinc are being discharged during rain events from the Facility to the Guadalupe River, a tributary of the San Francisco Bay which is the "Receiving Waters" for the Facility.

23

24

1

2

Failure to Conduct a QISP *Evaluation* and to Submit Level 1 ERA *Report*
for pH Affected Substances

3

4

5

116.   On information and belief, EDEN alleges Defendant exceeded the EPA Benchmark NAL for pH for the reporting year 2015-16 and entered Level 1 Exceedance Response Action ("ERA") status for pH affected substances on July 1, 2016.

6

7

8

117.   On information and belief, EDEN alleges Defendant is required to have a Qualified Industrial Storm Water Practitioner ("QISP") conduct an *evaluation* of the Facility by October 1, 2016, and to upload an adequate Level 1 ERA *Report* for pH on or before January 1, 2017.

9

10

11

118.   On information and belief, EDEN alleges Defendant failed to conduct a Level 1 evaluation for pH with the assistance of a QISP, to prepare a Level 1 ERA Report, and to upload it on to SMARTS system, a violation of the General Permit.

12

13

14

15

119.   Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants, including, but not limited to, pH and Zinc are being discharged during rain events from the Facility to the Guadalupe River, a tributary of the San Francisco Bay which is the "Receiving Waters" for the Facility.

16

Failure to Submit a Level 2 ERA *Action Plan* for pH Affected Substances

17

18

19

120.   On information and belief, EDEN alleges that while Facility was in Level 1 status, the Facility again exceeded the EPA Benchmark NAL for pH for the Reporting Year 2016-17 and that these results elevated Defendant to Level 2 status on July 1, 2017.

20

21

22

23

24

121.   Defendant was required to have a QISP certify and submit by way of SMARTS system a Level 2 ERA *Action Plan* that addresses each new Level 2 NAL exceedance at the Facility by January 1, 2018. On information and belief, EDEN alleges Defendant has failed to submit a Level 2 *Action Plan* for the Facility by uploading it onto the SMARTS system, a violation of the General Permit.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION

1   122.  Information available to EDEN indicates that as a result of these practices, storm

2   water containing excessive pollutants, including, but not limited to, pH and Zinc are being

3   discharged during rain events from the Facility to the Guadalupe River, a tributary of the San

4   Francisco Bay which is the "Receiving Waters" for the Facility.

5   <u>Failure to Submit Level 2 ERA *Technical Report* for pH Affected Substances</u>

6   123.  On information and belief, EDEN alleges Facility entered into Level 2 status on July 1,

7   2017, for the NAL Exceedance for pH affected substances, thus requiring Defendant to prepare a

8   Level 2 *Technical Report* by January 1, 2019.

9   124.  On information and belief, EDEN alleges Defendant has failed to submit a Level 2

10  *Technical Report* for the Facility by uploading it onto the SMARTS system, a violation of the

11  General Permit.

12  125.  Information available to EDEN indicates that as a result of these practices, storm

13  water containing excessive pollutants, including, but not limited to, pH affected substances and

14  Zinc are being discharged during rain events from the Facility to the Guadalupe River, a tributary

15  of the San Francisco Bay which is the "Receiving Waters" for the Facility.

16  <u>Failure to Update and/or Amend the SWPPP After Entering Level 1 Status</u>

17  126.  Defendant entered Level 1 status for pH substances on July 1, 2016, and was required to

18  prepare a Level 1 ERA Report with additional BMPs to address the problem which would then

19  be uploaded to SMARTS on or before January 1, 2017.

20  127.  On information and belief, EDEN alleges Defendant failed to update and/or amend the

21  SWPPP with the additional BMPs designed to address the pH exceedances.

22  128.  Information available to EDEN indicates that as a result of these practices, storm

23

24

water containing excessive pollutants, including, but not limited to, pH affected substances and Zinc are being discharged during rain events from the Facility to the Guadalupe River, a tributary of the San Francisco Bay which is the "Receiving Waters" for the Facility.

Falsification of Annual Reports

129.   EDEN is informed and believes Defendant has submitted falsified Annual Reports to the Regional Water Quality Control Board in violation of the General Permit.

130.   The General Permit provides that the Facility must collect and analyze two storm water samples in the first half of each reporting year, and two samples in the second half of each reporting year.  However, as discussed above, Defendant failed to collect and analyze all the required storm water samples during the reporting years.

131.   On June 30, 2016, June 28, 2017, June 29, 2018, September 1, 2020, November 23, 2021, and July 14, 2022, Defendant submitted its Annual Reports for the Fiscal Years 2015-16 through 2021-22. Mr. Lawrence Felix signed the Annual Reports for the reporting years under penalty of perjury as the Director of Corporate Affairs (Legally Responsible Person), on behalf of Defendant.

132.   Mr. Felix responded "Yes" to Question No. 3 on their Annual Reports ("Did you sample the required number of Qualifying Storm Events during the reporting year for all discharge locations, in accordance with Section XI.B?")  However, as noted above, Defendant has failed to collect and analyze all the required storm water samples during reporting years.

133.   If a Facility does not collect four storm water samples during a particular reporting year, the reporting requirements of the General Permit require the Facility to indicate "NO" to Question NO. 3 on the Facility Annual Report and to provide an explanation for why the

1    required number of samples were not collected. The explanation as to why there were

2    insufficient QSEs is to be provided in Attachment 1 to the Annual Report.

3        134.  Records from the National Oceanic and Atmospheric Administration (NOAA)

4    website/database confirm that during the reporting years at issue, there were sufficient Qualified

5    Storm Events (QSEs) occurring near the Facility during or within 12 hours of the start of regular

6    business hours to allow Defendant to collect the requisite number of samples. Further, EDEN is

7    informed and believes there were other Facilities near the Defendant's Facility that were able to

8    collect the required number of storm water samples during the Reporting Years.

9        135.  Based on the foregoing, it is clear that Defendant's Legally Responsible Person

10   intentionally made false statements in the Facility's Annual Reports when they indicated that the

11   Facility had collected samples according to the General Permit during the reporting years when

12   in fact the Facility did not collect the required number of samples.

13         Late-Filed Annual Reports

14       136.  The General Permit requires Defendant to certify and submit to SMARTS an Annual

15   Report no later than July 15, following each reporting year using the standardized format and

16   checklists in SMARTS.

17       137.  On information and belief, EDEN alleges Defendant's Annual Report for the reporting

18   years 2018-19 was due on or before July 15, 2019, however, Defendant failed to file the Annual

19   Report until November 23, 2021, a violation of the General Permit.

20       138.  On information and belief, EDEN alleges Defendant's Annual Report for the reporting

21   years 2019-20 was due on or before July 15, 2020, however, Defendnat failed to file the Annual

22   Report until September 1, 2020, a violation of the General Permit.

23

24

139.  On information and belief, EDEN alleges Defendant's Annual Report for the reporting years 2020-21 was due on or before July 15, 2021, however, Defendnat failed to file the Annual Report until November 23, 2021, a violation of the General Permit.

<u>Failure to Comply with The Mandates of The Regional Water Board</u>

140.  On information and belief, EDEN alleges the Regional Water Board inspected the Facility on October 21, 2021, and issued an inspection report requiring Defendant to make several revisions to its SWPPP, Site Map, as well as, to file missing Annual Reports.

141.  On information and belief, EDEN alleges Defendant's revisions and/or corrections were supposed to be uploaded to the SMARTS system by November 5, 2021.

142.  On information and belief, EDEN alleges Defendant has failed to make the necessary operational changes, to amend the SWPPP, to update the Site Map, and to incorporate new BMPs to address the exceedances, thus violating the Water Board's mandate which is a violation of the General Permit.

143.  Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants, including, but not limited to, affected pH substances and Zinc are being discharged during rain events from the Facility to the Guadalupe River, a tributary of the San Francisco Bay which is the "Receiving Waters" for the Facility.

<u>Failure to Train Employees</u>

144.  The General Permit requires all Facilities to designate a Legally Responsible Person to implement the requirements of the Permit, who is then responsible for appointing a Pollution Prevention Team and ensuring that the Team is properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

145.  Defendant's failure to train its employees and designate a Pollution Prevention Team is evidenced by the Facility's failure to develop and implement a satisfactory SWPPP or adequate BMPs at the Facility, failure to conduct monthly visual observations, and failure to comply with required storm water sampling and analysis procedures.

146.  On information and belief, Eden alleges that Defendant failed to appoint a Pollution Prevention Team for the Facility since at least the beginning of the Facility's operations, as required by the General Permit.

147.  Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants, including, but not limited to, affected pH substances and Zinc are being discharged during rain events from the Facility to the Guadalupe River, a tributary of the San Francisco Bay which is the "Receiving Waters" for the Facility.

148.   Information available to EDEN indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  EDEN is informed and believes, and thereupon alleges, that all the violations alleged in this Complaint are ongoing and continuing.

        Failure to Implement Best Management Practices ("BMP") and the Best Available
        Technology ("BAT") and the Best Conventional Technology ("BCT") at The Facility

149.  EDEN is informed and believes that Defendant has failed, since at least the beginning of the Facility's operations, to identify and implement Best Management Practices ("BMPs") at its Facility that comply with the requirements of the General Permit for best conventional treatment ("BCT") for conventional pollutants, and best available technology ("BAT") for toxic and non-conventional pollutants, a violation of the General Permit, sections I(C) and V(A). These technology-based pollution controls are required to be implemented in a manner that

1   reflects best industry practice considering technological availability and economic practicability

2   and achievability.

3   150.   Information available to EDEN indicates that Defendant has not fulfilled the

4   requirements set forth in the General Permit for discharges from the Facility due to the continued

5   discharge of contaminated storm water.  EDEN is informed and believes, and thereupon alleges,

6   that all the violations alleged in this Complaint are ongoing and continuing.

**FIRST CAUSE OF ACTION**
**Failure to Develop an Adequate Storm Water Pollution**
**Prevention Plan and Site Map**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

151.   Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth

herein.

152.   The General Permit requires dischargers of storm water associated with industrial

activity to develop and implement a SWPPP and Site Map.

153.   As outlined herein, Defendant has failed to develop and implement an adequate SWPPP

or Site Map for the Facility. The absence of requisite SWPPP and Site Map are ongoing and

continuous violations of the Act.

154.   Each day since at least the beginning of the Facility's operations, that Defendant failed

to develop an adequate SWPPP and Site Map for the Facility is a separate and distinct violation

of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

**SECOND CAUSE OF ACTION**
**Failure to Develop a Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

155.   Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth

herein.

156.   The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

157.   As outlined herein, Defendant has failed to develop and implement a monitoring and reporting program for its Facility.

158.   Defendant's ongoing failure to develop and implement a monitoring and reporting program are evidenced by its failure to collect storm water samples pursuant to the requirements of the General Permit.

159.   Each day since at least the beginning of the Facility's operations, that Defendant has failed to develop and implement a monitoring and reporting program for its Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

### THIRD CAUSE OF ACTION
### Failure to Implement the Best Available and
### Best Conventional Treatment Technologies
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

160.   Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

161.   The General Permit's SWPPP requirements and Effluent Limitation Section V(A) of the General Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

162.   Defendant failed to implement BAT and BCT at the Facility for pollutants of pH affected substances, Zinc and other potentially un-monitored pollutants, in violation of Effluent

Limitation Section V(A) of the General Permit.  The absence of requisite BAT and BCT are

ongoing and continuous violations of the Act.

163.  Each day since at least the beginning of the Facility's operations, that Defendant has

failed to develop and implement BAT and BCT in violation of the General Permit is a separate

and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

**FOURTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

164.  Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth

herein.

165.  Discharge Prohibition Section III(C) of the General Permit prohibits storm water

discharges and authorized non-storm water discharges that cause or threaten to cause pollution,

contamination, or nuisance.  Receiving Water Section VI(B) of the General Permit prohibits

storm water discharges to any surface or ground water that adversely impact human health or the

environment. Receiving Water Limitation Section VI(A) and Discharge Prohibition Section

III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of

any applicable water quality standards contained in Statewide Water Quality Control Plan or the

applicable Regional Board's Basin Plan.

166.  Plaintiff is informed and believes, and thereupon alleges, that since at least the

beginning of the Facility's operations, Defendant has been discharging polluted storm water

from the Facility, in excess of applicable water quality standards in violation of Receiving Water

Limitation Section VI(A) and Discharge Prohibition Section III(D) of the General Permit.

167.  During every rain event, storm water flows freely over exposed materials, waste

products, and other accumulated pollutants at the Facility, becoming contaminated with the

1  pollutants of pH affected substances, Zinc and other potentially un-monitored pollutants at levels

2  above applicable water quality standards. The storm water then flows untreated into the

3  Guadalupe River, a tributary of the San Francisco Bay which is the "Receiving Waters" for the

4  Facility.

5  168.  Plaintiff is informed and believes, and thereupon alleges, that these discharges of

6  contaminated storm water are causing or contributing to the violation of the applicable water

7  quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional

8  Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

9  169.  Plaintiff is informed and believes, and thereupon alleges, that these discharges of

10  contaminated storm water are adversely affecting human health and the environment in violation

11  of Receiving Water Limitations of the General Permit.

12  170.  Every day since at least the beginning of Facility's operations, that Defendant has

13  discharged and continues to discharge polluted storm water from its Facility in violation of the

14  General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §

15  1311(a).  These violations are ongoing and continuous.

16

**FIFTH CAUSE OF ACTION**
17  **Failure to Properly Train Facility Employees and Pollution Prevention Team**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**
18

19  171.  Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth

20  herein.

21  172.  Section X.D.1 of the General Permit requires each Facility to establish a Pollution

22  Prevention Team who is then responsible for assisting with the implementation of the

23  requirements of the General Permit. The Facility is also required to identify alternate team

24  members to implement the SWPPP and conduct required monitoring when the regularly assigned

1   Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of

2   town business, or other absences).

3       173.  Section X.H.f of the General Permit also requires that each facility ensure that all of its

4   Pollution Prevention Team members implementing the various compliance activities of the

5   General Permit are properly trained in at least the following minimum requirements: BMP

6   implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

7   Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

8       174.  Since at least the beginning of Facility's operations, Defendant has failed to properly

9   train Facility employees and the designated members of its Pollution Prevention Team, which

10  has resulted in the General Permit violations alleged herein and is a separate and distinct

11  violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and

12  continuous.

### SIXTH CAUSE OF ACTION
### (Recovery Under the Catalyst Theory CCP §1021.5)

15      175.  Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth

16  herein.

17      176.  Under the substantive law of California, if a plaintiff is a catalyst in encouraging a

18  Defendant to voluntarily comply with its legal obligations, the plaintiff may recover its fees and

19  costs.  *Graham v. DaimlerChrysler Corp.*, 101 P.3d 140, 21 Cal. Rptr. 3d 331, 34 Cal. 4th 553

20  (2004), *Tipton-Wittingham v. City of Los Angeles* (Cal.Dec. 2, 2004), 34 Cal.4th 604, 21

21  Cal.Rptr.3d 371, 101 P.3d. 174, 2004 Cal. LEXIS 11335.

22      177.  A requirement for recovery under the catalyst theory is that a plaintiff first advise the

23  Defendant of the claim and provide an opportunity to resolve the matter.  The Plaintiff in this

24  case complied by providing both the catalyst and the written notice of the claim to Defendants

prior to suit as demonstrated in EDEN's Notice of Intent to Sue attached hereto as Exhibit "A" and incorporated herein by reference. (Exhibit A, "60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act").")

178.  In the event Defendants allege the claims are moot or are non-justiciable, then Plaintiff must be awarded its fees and costs under California Code of Civil Procedure Section 1021.5 ("Catalyst Theory").

179.  Since the substantive law of California governs awards of Catalyst Theory fees (as opposed to Federal law), Plaintiff requests the Court exercise supplemental jurisdiction over any award of Catalyst Theory fees.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.    Declare Defendant to have violated and to be in violation of the CWA;

2.    Issue an injunction ordering Defendant to immediately operate the Facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.    Enjoin Defendant from discharging pollutants from Defendant's Facility to the surface waters surrounding the Facility until such time as Defendant has developed and implemented an adequate SWPPP, an updated Site Map and implemented appropriate BMPs;

4.    Order Defendant to pay civil penalties of $51,570 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5.    Order Defendant to take appropriate actions to restore the quality of United States waters impaired by its activities at Defendant's Facility;

6.      Order Defendant to pay EDEN's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law;

7.      Award Plaintiff additional attorney fees under California Code of Civil Procedure §1021.5, to the extent that Plaintiff's Notice of Intent to Sue directed to Defendant was the catalyst for Defendants' voluntary corrective action or cessation of the violations included in Plaintiff's Notice, provided that Defendant undertook any such corrective action after receiving Plaintiff's Notice, and;

8.      Award such other and further relief as may be just and proper.


Dated:  March 6, 2023          Respectfully,


By:  */s/ Craig A. Brandt*
          Craig A. Brandt
          Attorney for Plaintiff